Donshael Domanique Clark
T-50753
A2-119
P.O. Box 901
Imperial, CA 92251

In Propria Persona

ORIG FILED
JAN - 2 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY KM DEPUTY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

2254 ✓ 1983 ___
FILING FEE PAID
Yes ___ No ✓
IFP MOTION FILED
Yes ✓ No ___
COPIES SENT TO
Court ✓ ProSe ___

DONSHAEL DOMANIQUE CLARK (Petitioner)

v.

VICTOR M. ALMAGER (Warden) (Respondent)

'08 CV 0014 H WMc

Case No. ______________

BRIEF IN SUPPORT OF
PETITION FOR
WRIT OF HABEAS CORPUS

III. THE JUDGMENT OUGHT TO BE REVERSED UNDER THE DOCTRINES OF THE CLOSE CASE AND CUMULATIVE ERROR ---------------------------------------- 43

IV. UNDER CUNNINGHAM V. CALIFORNIA, 549 U.S. ____ (2007) PETITIONER'S 6TH & 14TH AMENDMENT RIGHTS WERE VIOLATED, WHERE THE SENTENCING COURT ELEVATED HIS SENTENCE FROM THE MID-TERM TO THE HIGH-TERM BASED ON FACTORS NOT FOUND BY A JURY -------------------- 44

CONCLUSION ------------------------------------------------------ 48

RELIEF SOUGHT ---------------------------------------------------- 49

VERIFICATION / PROOF OF SERVICE

APPENDIX

EXHIBIT A ; ORDER DENYING HABEAS CORPUS PETITION NO. SWC 000104

EXHIBIT B ; ORDER DENYING HABEAS CORPUS PETITION NO. E041522

EXHIBIT C ; ORDER DENYING HABEAS CORPUS PETITION NO. S148977

EXHIBIT D ; ORDER TO SHOW CAUSE, CASE NO. SWC 000172
ORDER DENYING HABEAS CORPUS PETITION NO. SWC 000172

# TABLE OF AUTHORITIES

## CASES

Almendarez-Torres v. United States (1998)
523 U.S. 224 — 27, 28, 29

Apprendi v. New Jersey (2000)
530 U.S. 466 — 25, 26, 27, 28

Blakely v. Washington (2004)
542 U.S.__ [124 S.Ct. 2531]
2, 3, 4, 23, 24, 25, 26, 28, 30

Boyd v. United States (1892) 142 U.S. 450 — 7

Brinegar v. United States (1949) 338 U.S. 160 — 7

Chaidez v. Knowles (9th Cir. 2003)
258 F.Supp.2d 1069 — 7

Chambers v. Mississippi (1973) 410 U.S. 284 — 8

Chapman v. California (1967) 386 U.S. 18 — 27

Crane v. Kentucky (1986) 476 U.S. 683 — 15-16

| | |
|---|---|
| Davis v. Alaska (1974) 415 U.S. 308 | 7, 22 |
| Delaware v. Van Arsdall (1986) 475 U.S. 673 | 22 |
| Donnelly v. DeChristoforo (1974) 416 U.S. 637 | 23 |
| Estelle v. McGuire (1991) 502 U.S. 62 | 6, 7 |
| Franklin v. Henry (9th Cir. 1997) 122 F.3d 1270 | 22 |
| Garceau v. Woodford (9th Cir. 2001) 275 F.3d 769 | 6 |
| Green v. Georgia (1979) 442 U.S. 95 | 7 |
| Green v. United States (D.C. Cir. 1994) 651 A.2d 817 | 21 |
| Greer v. Miller (1987) 483 U.S. 756 | 23 |
| Harris v. United States (2002) 536 U.S. 545 | 29 |
| Henry v. Estelle (9th Cir. 1993) 993 F.2d 1423 | 6 |
| In re Martin (1987) 44 Cal.3d 1 | 16 |
| In re Winship (1970) 397 U.S. 358 | 26 |
| Jones v. United States (1999) 526 U.S. 227 | 29 |
| McDowell v. Calderon (9th Cir. 1997) 130 F.3d 833 | 18 |
| McKinney v. Rees (9th Cir. 1993) 993 F.2d 1378 | 6 |
| Neder v. United States (1999) 527 U.S. 1 | 27 |
| Old Chief v. United States (1997) 519 U.S. 172 | 8 |
| Olden v. Kentucky (1998) 488 U.S. 227 | 22 |
| O'Sullivan v. Boerckel (1999) 526 U.S. 838 | 2 |
| Panzavecchia v. Wainwright (5th Cir. 1981) 658 F.2d 337 | 6 |

| | |
|---|---|
| Payne v. Tennessee (1991) 501 U.S. 808 | 6 |
| Payton v. Woodford (9th Cir. 2002) 299 F.3d 815 | 22 |
| People v. Alcala (1984) 36 Cal.3d 604 | 8 |
| People v. Babbitt (1988) 45 Cal.3d 660 | 16 |
| People v. Balcom (1994) 7 Cal.4th 414 | 9 |
| People v. Black [nonpub. opn.] review granted July 28, 2004, S126182 | 2 |
| People v. Briggs (1962) 58 Cal.2d 385 | 22 |
| People v. Brown (2000) 77 Cal.App.4th 1324 | 14 |
| People v. Catlin (2001) 26 Cal.4th 81 | 10 |
| People v. Collins (1968) 68 Cal.2d 319 | 23 |
| People v. Cook (1905) 148 Cal. 334 | 17 |
| People v. Cruz (1964) 61 Cal.2d 861 | 14 |
| People v. Cunningham (2001) 25 Cal.4th 926 | 16 |
| People v. Ewoldt (1994) 7 Cal.4th 380 | 6, 9, 17 |
| People v. Falsetta (1999) 21 Cal.4th 903 | 13, 14 |
| People v. Fitch (1997) 55 Cal.App.4th 172 | 14 |
| People v. Flannel (1979) 25 Cal.3d 668 | 9 |
| People v. Haston (1968) 69 Cal.2d 233 | 10 |
| People v. Hill (1998) 17 Cal.4th 800 | 23 |
| People v. Hoover (2000) 77 Cal.App.4th 1020 | 14 |
| People v. Jennings (2000) 81 Cal.App.4th 1301 | 14 |
| People v. Kane (1946) 27 Cal.2d 693 | 18 |

| | |
|---|---|
| People v. Kelley (1967) 66 Cal.2d 232 | 10 |
| People v. Lewis (1991) 229 Cal.App.3d 259 | 26 |
| People v. Mayfield (1972) 23 Cal.App.3d 236 | 16 |
| People v. Mayo (1961) 194 Cal.App.2d 527 | 18 |
| People v. Miller (1990) 50 Cal.3d 954 | 10 |
| People v. Osband (1996) 13 Cal.4th 622 | 27 |
| People v. Robbins (1988) 45 Cal.3d 867 | 10 |
| People v. Runnion (1994) 30 Cal.App.4th 852 | 18 |
| People v. Salas (1994) 30 Cal.App.4th 417 | 16 |
| People v. Sears (1970) 2 Cal.3d 180 | 17 |
| People v. Shoemaker (1982) 135 Cal.App.3d 442 | 16 |
| People v. Simon (1995) 9 Cal.4th 493 | 18 |
| People v. Thornton (1974) 11 Cal.3d 738 | 9 |
| People v. Towne [nonpub. opn.] review granted July 14, 2004, S125677 | 2 |
| People v. Vargas (1988) 204 Cal.App.3d 1455 | 18 |
| People v. Von Villa (1992) 11 Cal.App.4th 175 | 22 |
| People v. Wagner (1975) 13 Cal.3d 612 | 23 |
| People v. Waidla (2000) 22 Cal.4th 690 | 13 |
| People v. Woodard (1979) 23 Cal.3d 329 | 14 |
| Rock v. Arkansas (1987) 483 U.S. 44 | 7 |
| Rose v. Clark (1966) 478 U.S. 570 | 27 |

Shepard v. United States (2005)
__U.S.__ [125 S.Ct. 1254] 28, 29, 30

Smith v. Pliler (9th Cir. 2003) 278 F.Supp.2d 1060 7

Spencer v. Texas (1967) 385 U.S. 554 7

Strickland v. Washington (1984) 466 U.S. 668 17

Sullivan v. Louisiana (1993) 508 U.S. 275 27

United States v. Bess (6th Cir. 1979) 593 F.2d 749 22

United States v. Burkhart (10th Cir. 1972)
458 F.2d 201 6

United States v. Carroll (6th Cir. 1994)
36 F.3d 1380 22

United States v. McLister (9th Cir. 1979)
608 F.2d 785 23

United States v. Pierre (9th Cir. 2001)
254 F.3d 872 18

United States v. Sayetsitty (9th Cir. 1997)
107 F.3d 1405 17

United States v. Wallace (9th Cir. 1988)
848 F.2d 1464 23

Washington v. Texas (1967) 388 U.S. 14 8, 16

Webb v. Texas (1972) 409 U.S. 95 16

**STATUTES**

Evidence Code 11, 13, 14, 16, 23
section 352 18
section 502 6
section 1101 8
subdivision (a) 4, 9, 20
subdivision (b) 22, 23
subdivision (c)

Penal Code
section 1170 24

18 United States Code
section 924 27


**CONSTITUTIONS**


California Constitution
article I
section 15 6, 16, 24
section 16 6, 24

United States Constitution
Compulsory Process Clause 15, 16
Due Process Clause 6, 15, 17
Fifth Amendment 6, 13, 19, 24
Fourteenth Amendment 6, 13, 15, 16, 17, 19, 22, 24, 29
Sixth Amendment 6, 13, 16, 17, 19, 22, 24, 29


**INSTRUCTIONS**


CALJIC
No. 2.50 1, 3, 6, 17


**RULES**


California Rules of Court
rule 420 25
rule 4.420(b) 26
rule 28 1
subdivision (d)(2) 3
rule 28.2 1
rule 29 1
rule 33(b)(1) 30

# STATEMENT OF QUESTIONS PRESENTED

1. WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF CLARK'S 1994 BANK ROBBERY, CURTAILING HIS CROSS-EXAMINATION OF THE KEY WITNESS ON THAT ISSUE, AND REFUSING A NEEDED MODIFICATION OF A STANDARD INSTRUCTION TO HIGHLIGHT HIS DEFENSE THEORY, VIOLATING HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

   Petitioner answers "yes."

2. WHETHER THE COURT ERRED IN EXCLUDING BASSE'S ADMISSION THAT SHE HAD FALSELY ACCUSED HER BOYFRIEND SO THAT SHE COULD STEAL HIS MONEY WHEN HE WENT TO JAIL.

   Petitioner answers "yes."

3. WHETHER THE JUDGMENT OUGHT TO BE REVERSED UNDER DOTRINES OF CLOSE CASE AND CUMULATIVE ERROR.

   Petitioner answers "yes."

4. WHETHER UNDER CUNNINGHAM V. CALIFORNIA, 549 U.S. ____ (2007) PETITIONER'S 6TH & 14TH AMENDMENT RIGHTS WERE VIOLATED, WHERE THE SENTENCING COURT ELEVATED HIS SENTENCE FROM THE MID-TERM TO THE HIGH-TERM, BASED ON AGGRAVATING FACTORS NOT FOUND BY A JURY.

   Petitioner answers "yes."

# VERIFICATION

STATE OF CALIFORNIA ) On this day, Listed Court Pleadings Were Given
COUNTY OF IMPERIAL ) To Prison Official For Filing/Mailing
( C.C. P. §446 & 2015.5; 28 U.S.C. §1746

I, Donshael D. Clark, declare under penalty of perjury that: I am the Petitioner in the above-entitled action; I have read the foregoing documents and know the contents thereof; and the same is true of my own knowledge except as to matters stated therein upon information and belief, and as to those matters, I believe they are true:

Executed this DECEMBER day of 28th, 2007, at Centinela State Prison, P.O. Box 901, Imperial, CA 92251

[Signature] ______________________
DECLARANT/PRISONER

*****************************************

## PROOF OF SERVICE BY MAIL

( C.C.P. Sec. §1013 (a) & 2015.5; 28 U.S.C. Sec.§1746.)

I, Donshael D. Clark, am a resident of Centinela State Prison, in the County of Imperial, State of California; I am over the age of eighteen (18) years and am [redacted] a party of the above-entitled action. My state prison address is:

P.O. BOX 901, Imperial, CA 92251.

On DECEMBER 28th, 2007, I served the foregoing:

writ of HaBeus corpus

(Set forth the exact title of document (s) served.)

on the part (s) herein by placing a true copy (s) thereof, enclosed in a sealed envelope (s), with postage thereon fully paid, in the United States Mail, in a deposit box so provided at Centinela State Prison, P.O.Box 901, Imperial, CA 92251, addresses:

OFFICE OF ATTORNEY
GENERAL
110 WEST "A" St., SUITE #1100
San DieGO, CA. 92101

There is delivery service by United States Mail at the so addressed, and/or there is regular communication by mail between the place of mailing and the place so addressed. I declare under penalty of perjury that the foregoing is true and correct.

Dated: DECEMBER 28, 2007

______________________
DECLARANT/PRISONER

Donshael Domanique Clark
T-50753
A2-119-U
P.O. Box 901
Imperial, CA 92251

In Propria Persona

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONSHAEL DOMANIQUE CLARK (Petitioner) v. VICTOR M. ALMAGER (Respondent) | Case No.________________ |

## BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

## STATEMENT OF THE CASE

By second amended information filed in Riverside Superior Court on January 20, 2004, appellant Donshael Dominique Clark was charged with one count of robbery (§ 211), one count of intimidating a witness by means of force or threat of injury (Pen Code, § 136.1, subd. (c)),

and an enhancement based on a principal in the robbery being armed with a firearm. (Pen. Code, § 12022, subd. (a)(1).) One serious felony/strike prior was alleged. (Pen. Code, §§ 667, subd. (a), (c) and (e)(1) & 1170.12, subd. (c)(1).) (CT 30, 40-41; 1RT 10-12, 92-93.)[1]

The information charged Clark's brother, Ahmand Rashad Williams, with the robbery but not with intimidating the witness. (CT 40-41; 1RT 34, 72-73.)

The defendants were tried together before separate juries. (CT 43-44; 1RT 34, 68-73, 77, 80-81.) Clark ultimately admitted the prior. (CT 46, 143, 151; 1RT 34, 88-89, 3RT 737-738, 747-749, 755-756.) On February 6, 2004, Clark's jury convicted him on both counts and found the principal arming allegation true. (CT 145, 147, 149; 3RT 738-742.)

On April 2, 2004, Clark was sentenced to the five year upper term on the robbery count, doubled by reason of the strike prior, plus one year for the principal

---

[1] The priors were initially alleged to be a robbery in violation of section 211, but the information was orally amended to reflect that the conviction was actually for a bank robbery in violation of 18 U.S.C. section 2113, subdivision (a)(d), a federal equivalent of the state offense of robbery. (CT 46; 1RT 92-93.)

arming enhancement, or eleven years. An additional consecutive three-year mid-term for intimidating a witness, doubled for the strike prior to six years, was imposed, and five years were added under for the serious felony prior enhancement, for a total sentence of 22 years. (CT 153, 155-157, 159-160; 3RT 762-764.)

From that judgment this timely appeal has been taken. (CT 158.)

## STATEMENT OF FACTS

**Prosecution case.**

a. **The robbery.** On the evening of Friday, October 20, 2000, between 8:00 and 9:00 o'clock, Monica Espinoza was the service desk supervisor at the Hemet Kmart at 220 W. Stetson Avenue when a man wearing a black ski mask and carrying a dark cloth duffel bag or backpack leaped over the counter of the desk. A second man, also wearing a dark ski mask, was on the other side of the counter, holding what Espinoza believed was a revolver. (CT 72; 1RT 116-120, 122-124, 127-132, 134-135, 140-147, 3RT 658-659.) From skin visible around their eyes and below their masks, the men appeared to be African American. (1RT 120-121.) The man who leaped the counter

was about five feet seven inches tall and was more heavy set than the other man, who seemed slimmer and taller. (1RT 137-139, 141.)

The man who jumped the counter told Espinoza to give him money and emptied the register, placing the money in the bag and jumping back over the counter and running out the door with the other man. The robbers got about $350. (1RT 121-122, 124-126, 132, 136.)

No one was made to lie on the floor, no one was ordered to move to any other location in the store, no attempt was made to empty any other registers and the robbers did not ask about a safe. (1RT 135-137.)

That evening, June Vrablic was riding in a car that pulled up in front of the Kmart just as two persons of unknown race and gender ran toward the front door from the west and entered. It was getting dark and the two persons wore coats and ski masks. One was a little taller and the other was a little heavier. Vrablic told her son, who was driving, to stop and watched through the store's glass doors as one of them jumped behind the service counter and then back out, while his companion stood nervously by. The two then ran out the front door.

The two ran back west across the parking lot and leaped a wall into an adjacent vacant lot. One of them had a noticeable limp that slowed him somewhat and one of them, perhaps the same one, may have had difficulty clearing the wall. (1RT 156-161, 168-172, 180-184, 183-189, 191.)

Vrablic, who was familiar with the area, told her son to drive west on Stetson, then north on Gilbert. She saw a car speed off from half a block in front of them and turn west on a cross-street. (1RT 161-165, 172-174, 180-181.) They drove past the cross-street to Johnston Avenue and pulled into a parking lot to turn around. The same car sped past them, going northbound toward Florida Avenue. It was small and light in color and it had one headlight and one taillight out. She did not get a license number. She saw two people in front, but could not be sure if there was anyone in back or not. In earlier proceedings, she had testified that there might have been a third person in back with an Afro hairdo. A photograph of Jodie Basse's car showed a car very similar to the one she had seen that night. (1RT 161-168, 172-181, 192-193.)

**b. Jodie Basse.** Jodie Basse met Clark about four

days before the robbery. She and her friend Diane Gonzalez had spent the evening in Riverside with him and a man nicknamed "Black." Gonzalez went home and the two men slept that night at Basse's apartment in Colton. The next morning Basse and Clark took Black back to Riverside and they spent the rest of the day playing miniature golf and visiting Clark's niece or cousin in the hospital, where she had just had a baby. They went back to Basse's apartment for the night. (1RT 196-205, 2RT 335-337, 349-351, 372-373, 415.)

Basse rented a car the next day because her tags had expired, and Clark helped her move most of her things from the house, from which she was being evicted, either to Diane Gonzalez's place in East Highland or to storage. (1RT 205, 207-209, 2RT 373, 375, 377.) They stayed that night at Basse's place in Colton and the relationship became sexual. (1RT 204, 209, 2RT 389, 415.)

Basse did not recall anyone named Karen Ritt coming to pick Clark up at any point during his stay at her apartment in Colton, but acknowledged that it could have happened. (2RT 336, 390, 426-427.)

The next morning, Basse returned the rental car and

that afternoon, around 4:00 or 5:00, Basse and Clark drove in her car to a triplex on Wood Road in Riverside, where they picked up Clark's brother, co-defendant Williams. (1RT 210-214.) Williams, like Clark, was dressed in heavy, dark clothing and a jacket. The brothers had a duffel bag or backpack with them. (1RT 213, 230, 2RT 322, 338-339.)

From Wood Road, they went on to a house in Perris to visit some friends of the brothers. Both brothers got out of the car and went to the door, while Basse waited in the car. They talked for 10 minutes with a tall black man who came to the door, then returned to the car. The three continued on to Hemet, where the brothers wanted to see some family members. Williams drove because Basse did not know the road and did not like driving at night. (1RT 210, 214-218, 2RT 322-324, 382-383.)

As they reached Hemet, Basse had to go to the bathroom, so they stopped at a McDonald's on Florida Avenue. (1RT 218-219, 2RT 333.) When Basse came back out five minutes later, her car was gone. At first she thought they were playing a prank and spent several minutes looking for them. After waiting five minutes,

she tried calling Diane Gonzalez collect from a pay phone, but in several attempts could get only her answering machine. She then called Deborah Doucakis, a friend with whom she was then in almost daily contact, also collect. Doucakis was home. She made only that one call to Doucakis, lasting 10 to 15 minutes. (1RT 209-210, 219-221, 2RT 315, 324, 337-338, 342-344, 422-423.)

Phone records, however, gave a somewhat different picture. They showed that Basse made one call to Gonzalez, one to Doucakis, then two more to Gonzalez. Basse was not able to explain this discrepancy. (2RT 342-347.)

Basse explained her situation and Doucakis advised her to call the police. As she was about to hang up the brothers returned with her car and she told Doucakis she had to go because they were back, then hung up and got in the car. (1RT 221-223, 2RT 344-345.)

The brothers seemed nervous. Williams told Basse to take the wheel, telling her "Go, go," and saying they had just robbed a Kmart. (1RT 224-228, 2RT 315, 326.) This was the first mention of a robbery; there had been no discussion of a robbery on the way to Hemet. (2RT 339.)

Williams was in the front passenger seat and Basse saw a revolver in his lap. She saw him open and close the cylinder and perhaps remove and replace the bullets. (1RT 229-230, 233, 2RT 349, 351-357.) From the back seat, where Clark was seated, came the sound of money being counted and after a mile or two Clark said in a disappointed tone that it had been a "dry run" and that they had gotten only $400. (1RT 228-229, 230-233, 2RT 356-357.) Basse glimpsed a white plastic Kmart bag in the back but did not see the money. (1RT 231-232.) At one point, Basse saw Williams throw a dark-colored cloth object like a hat or a beanie from the passenger's window, after which appellant did likewise. A bag or a backpack was also thrown out. (1RT 235-237, 2RT 315, 324-325, 331.) Until then she had not seen masks or a gun in the possession of either man. (2RT 330.) Throughout the drive, Clark warned Basse not to tell anyone about the robbery and told her they would come back and get her if she did. (2RT 364-365, 418.)

They drove back to Wood Road, where Williams carried the Kmart bag with the money in it into the house, returning in five to 10 minutes. Basse then drove them

to a Motel 6 in Riverside off University. (1RT 233-235, 237-239, 2RT 326-327, 423.) When they arrived, a white Chevrolet Caprice she had seen at the Perris address was there, as was the tall black man. Williams got out to talk to the man, but Clark remained long enough to tell Basse there was nothing to worry about because no one had seen them or the car, which had been parked at an apartment complex, and he warned her not to tell anyone what had happened because his brother was a cold-blooded gang banger and killer. Basse replied that she would not tell anyone and left them there. (1RT 239-242, 2RT 327-328, 362-363, 369-370, 421-422.)

Basse, because she had vacated her apartment that day, then went to a room in a Motel 6 in San Bernardino on Redlands Boulevard near the 91 and the 10 freeways. Diane Gonzales may have rented the room for her. She called Diane Gonzalez from there but did not mention the robbery because she was scared. She may also have called Deborah Doucakis, and if she did, she said nothing about the robbery to her, either. (1RT 242-245, 2RT 328, 336, 370, 376, 384, 415-416, 423-424, 427.)

Basse denied telling Doucakis that she was in Norco,

that they had stopped for food or that she had already called the police. She denied calling Doucakis later that night and saying that she had found her car in a WalMart or Kmart parking lot with the keys on the floor or that she was driving off in it when Clark and his cousin appeared. She also denied later telling Doucakis she had spent the night in jail and Clark had gotten her out. (2RT 384-385, 387.)

A few days later, probably on a Tuesday or Thursday, Basse told her counselor, Susanne Seinz, about the robbery and possibly about the threats. The meeting could also have happened on Monday, October 23. Seinz advised Basse to go to the police and said she would find out what she could. (1RT 246-247, 2RT 348-349, 378, 380-381, 425-426.)

A day or two after, Clark came to Diane Gonzalez's place, where Basse was staying, repeated that his brother was a gang banger and that if she said anything, action would be taken against her. She said she would not tell anyone. (1RT 245-246, 248-249, 2RT 328-329, 362-363.)

Possibly around December 5, 2000, Basse learned the police had been looking for her and asked Seinz to

accompany her when she talked to the police. Seinz called Detective Jim Anderson of the Hemet police and set up a meeting for that evening in Hemet. The interview with Jim Anderson was tape recorded and took about an hour. (1RT 250-253, 2RT 314, 319, 332, 335, 348, 371.)

The next time Basse saw Clark, a week or two after her last encounter, she had already spoken with the police. Clark knew the police were looking for him, asked her if she had said anything to anyone, and she told him she had not. She had Diane Gonzalez call Jim Anderson while she talked to Clark, but Clark left before Anderson could send anyone out. (1RT 249-250, 253-254.)

On cross-examination Basse's statement to the police varied somewhat from her testimony at trial. Basse told Anderson that the bag thrown from the car after the robbery was a white Kmart bag, that the brothers got the gun and perhaps the duffel bag or backpack from the Perris address, not Woods Road, that Clark came by her room the day after the robbery, not several days later, that she was threatened on three occasions, not two, that she rented the room in the Motel 6 for three or four days, not one, that she still lived at the Colton

apartment as of October 20, and that she met Clark two days before the robbery, not four. She told Anderson that Clark's threats portrayed his brother as a cold-blooded killer but she omitted any mention of gang membership. And she told Anderson she had gotten inside information about the robbery through Seinz, whose daughter's pregnant friend had been working at the courtesy desk at the time of the robbery, while at trial she said she got few or no details from Seinz. (2RT 315-320, 340, 362-365, 371-372, 375-377, 379-380, 387-388.)

Basse's trial testimony also varied from her testimony at the preliminary hearing and the first trial on such subjects as how she met Clark, how long before the robbery she had known him, the timing and duration of their stops at Woods Road and Perris, whether the white plastic bag said "Kmart" and whether it was that bag or the duffel bag or backpack that was thrown from the car, whether the cloth objects thrown from the car were black beanies or ski masks, how soon after the robbery the first threat came and whether the threat involved mention of "Crips," how soon after the robbery she reported the crime to Seinz, how far into her phone conversation with

Doucakis that Doucakis had suggested calling the police, which brother was seated where during the drive from Woods Road to the Motel 6, whether she called Doucakis a second time on October 20 and whether she rented the rental car the day before the robbery. (2RT 320-326, 329, 331-335, 358-362, 365-366, 370-371, 374, 380-381, 387-389, 418-419 428-429.)

Basse noted that Clark walked with a slight limp. (1RT 213-214, 2RT 420.) Of the two brothers, Clark was the bigger. (2RT 417-418.)

Basse identified photographs of her car, an '84 or '85 Toyota Tercel with crash damage in front, a broken headlight, malfunctioning taillight and heavy tinting on the rear side windows. (1RT 201, 205-207, 2RT 386-387.)

c. **The investigation.** Susanne McLain, nee Seinz, was Basse's counselor at the time of the robbery and thereafter. On an unknown date in October when McLain was not scheduled to see her, Basse came to the clinic in the morning and asked McLain for an urgent one-on-one appointment. Basse was upset and crying and scared. Although clinic records showed a visit by Basse on October 20, McLain doubted this was the true date, since

the robbery had not yet occurred.

The records for October 20 contained little detail on what was discussed: "[t]he client reports having knowledge of an armed robbery. Client was advised to report what she knew to the police." (1RT 277-278, 282-283, 285-287, 3RT 597-598, 658-659.)

If the robbery took place on the evening of Friday, October 20, the first chance Basse would have had to get in touch with McLain would have been Monday, October 23. The records did reflect that McLain saw Basse that day, but they indicated that it was a group session and did not show the robbery was discussed that day. It was possible, however, that Basse came in early and talked to McLain privately before her group session. (1RT 269-271, 277-278, 285-287, 291-294, 298-300, 302, 304-306, 3RT 597-598, 658-659.)

Basse told McLain that the day before[2] she had gone to Hemet with Clark and his brother, they had stopped at the McDonald's on Florida so she could use the rest room and when she came out they were gone. Basse said she

---

[2] McLain acknowledged that if Basse saw McLain on Monday, October 23, this assertion could not be correct. (1RT 298.)

tried unsuccessfully to call McLain, then called a friend named Debbie collect, crying hysterically, and that after 45 minutes, the brothers showed up. She asked to drive and as they headed out of town the brother in the back seat began throwing things out of the window. He had a Kmart bag containing what they said was $450. The brother in the passenger seat had a gun in his lap. (1RT 271-274, 295-297.)

Basse stated that she was afraid of both because Clark was a dangerous man who would go to any lengths to keep her from telling what had happened and because her car had been used in the robbery. She did not, however, mention any specific threats. (1RT 274-275, 297.)

McLain could not say anything to the police because of client confidentiality, but she told Basse that Basse's main duty was to report the crime, that since she was being evicted anyway she should move where Clark could not find her and that she should have a plan of action to discuss at their next session. (1RT 274-275.)

There was in fact a later follow-up individual session, perhaps in November or December. Clinic records showed a date of December 5, and McLain believed this was

the date. (1RT 276, 278-279, 302-303.) Basse called to set up the session because she had heard the Hemet Police were looking for her and she feared arrest. McLain got a waiver of confidentiality from her, contacted Hemet Detective Jim Anderson, arranged a meeting with him that evening, put gas in Basse's car so she could make the meeting, escorted her to Hemet and introduced her to Anderson. (1RT 279-282.)

McLain's daughter had a pregnant friend[3] who was working at the Kmart at the time of the robbery. The daughter had mentioned this fact to McLain but did not supply any details, nor did McLain tell Basse that she had. (1RT 288-290.)

Detective Jim Anderson of the Hemet Police, first became aware of the robbery when, on November 21, 2000, he received a call from his brother, Ron, of the Corona Police, about the robbery of a Kmart either in Norco or Hemet on October 20, and found a report on the subject robbery. (2RT 431-433.) His brother Ron had said Debbie

---

[3] This person was inferably Monica Espinoza, who was in fact pregnant at the time. But Espinoza did not recall discussing the robbery with anyone whose mother was named Susanne Seinz or with any friends outside the store. (1RT 121, 130, 142-143.)

Doucakis was his source, and Anderson called her that day. Doucakis provided Jodie Basse's name and the gist of Basse's call of October 20 (2RT 433-436), a tip believable enough to merit investigation. (1RT 448-449.) He tried without success for several days to find Basse and was contacted by Basse's counselor, who put him in touch with Basse on December 5, 2000. (2RT 436-438.) He talked with Basse on the phone and got some of the details of the robbery and the identities of the robbers, but wanted her to give a taped interview, which she did later that same day. (2RT 438-441, 449-450.)

During the interview, Basse said she met Clark about two days before the robbery. She told Anderson about the two places they had visited on the way to Hemet and the stop at McDonald's to use the restroom. When she came out her car was gone. She thought it was a prank, but when she could not find her car, she used a pay phone to make collect calls first to Diane Gonzalez and, when she could get only Gonzalez' answering machine, then to Debbie Doucakis, with whom she did talk. She was just finishing talking to Doucakis when they returned with her car. They told her to drive. On the drive back to

Riverside, Williams, in the passenger seat, toyed with a silver revolver, opening the cylinder and removing the bullets, while Clark sat in back. They threw two beanies or ski masks and a white Kmart bag out the passenger's window. After dropping them off she went to a room in Colton which she rented for three or four days. She also said that Clark came by the room the day after the robbery. (2RT 440-443, 455-458.)

She told Anderson that a pregnant friend of the daughter of her counselor had been present during the robbery, but Anderson did not know what, if any, details got passed along to Basse. (2RT 458-459.) Anderson thought Basse mentioned gang membership during the interview, but neither the transcript of the interview nor his report nor her written statement reflected that she had. (2RT 450-452.)

Anderson checked Doucakis' phone records and verified that she had received a collect call from the McDonald's pay phone. Diane Gonzalez's phone records showed three collect calls from that phone. The McDonald's was about two and a half miles from the Kmart. (2RT 443-444, 445-447, 453-454.)

d. **The prior conviction.** John MacDonald, an FBI agent assigned to the bank robbery squad in Riverside County on August 29, 1994. investigated the robbery of a bank in the Canyon Crest area that morning. (2RT 393-394, 400.) Two men were arrested for the robbery after a car chase which resulted in a crash, and one of them was Clark. (2RT 394-395.)

MacDonald reviewed a videotape of the robbery, which showed two masked men entering the single customer entrance to the bank and leaping over the counter. One man, the taller of the two, was armed. He took one or more tellers to the vault area, while the shorter, stockier man, who may or may not also have been armed, cleaned out the two open tellers' drawers. The two then left the bank by the same entrance. The robbery was over "pretty quickly." He also interviewed witnesses, who believed both men had been armed. (2RT 396, 402-404, 405, 408-409.)

MacDonald interviewed Clark later that day and Clark admitted his role but was reluctant to talk about his accomplice. He said they used a car he stole the day before for a getaway car, but they did not have a drop

off car. They made the masks by cutting holes in the fabric from a sweat shirt or T-shirt. Clark said he gave his accomplice a BB pistol and claimed he was not armed -- the only point on which his statement varied from information obtained from other sources. Inside the bank, the men jumped over the counter and Clark got money from the counter area. The men had no bag and carried the money off in their pockets and hands. They fled the bank and were running to the getaway car they left behind the shopping center when the dye packs concealed in the money went off in their pockets. They jettisoned the money, continued fleeing and a car chase ensued, ending when the car rolled over several times, ejecting Clark. Clark sustained several injuries: his arm was bandaged, he had scratches and abrasions, and was limping. He planned the robbery for at least a week. The masks were recovered from the car, but the gun was never found, and since it was not fired during the robbery there was no way to verify whether it was in fact a BB gun. (2RT 396-402, 404-405, 409-412.)

**Defense case.** Radiologist Arnold Geller, M.D., was on duty at Riverside General Hospital on August 29, 1994,

when Clark was brought in after an automobile accident. Geller noted an abrasion to his left thigh, but no fracture was detected. On the basis of the medical records, Geller could not say whether Clark would have lingering injuries six years later. (2RT 475-479.)

Kristen Ritt testified that on October 16, 2000, she encountered Clark, an old childhood friend, and Jodie Basse at the hospital where they were visiting a cousin of Clark's who had just had a baby. (3RT 545-546.)

Early in the afternoon of October 17, 2000, she and a friend named Stacy went to a motel near the 215 and 10 freeways in San Bernardino to visit Clark and Basse was there. Basse was not happy and checked both Clark and herself out of the room. Ritt took Clark with her to Riverside where her cousin Jodie Williams lived with her husband, Daryl, also known as "Blackout" or "Black," and eight or nine other people. Clark stayed there the next five or six days. (3RT 520-527, 534, 544, 549-550.)

On the evening of October 20, 2000, Clark was with her and her five children, shopping for Halloween costumes at a nearby Wal-Mart. Ritt was certain this was on the 20th, because it was her payday, and it was the

last payday before Halloween. (3RT 527-537, 548-549, 658-659.) A paycheck stub dated October 20 was introduced in evidence. (3RT 597-598, 658-659.)

Clark lived at a different address with Ritt and Stacy and the two women's children from November of 2000 until his arrest in March of 2001. He and Stacy were romantically involved. (3RT 537-540, 550-551.) Ritt learned of the arrest from Stacy and went to see Clark in jail, but never said anything to anyone about the Halloween shopping expedition at Wal-Mart until she was contacted by an investigator in August of 2001 and recalled what they had been doing on the evening of October 20. (3RT 540-544, 547.)

Deborah Doucakis, called by co-defendant Williams, testified that she met Jodie Basse about six months before the robbery when both worked for Wackenhut and that the two were friends until some time after the robbery. (3RT 553-554, 563.)

On October 20, 2000, around 7:00 p.m., Doucakis received a 15 minute collect phone call from Basse, who was upset and crying. Basse said that she was calling from a pay phone at a McDonald's in Hemet and that Clark

had taken her car while she was inside getting food. Doucakis urged her several times to call the police. Finally, Basse said that she already had -- which Doucakis thought strange -- and that they had told her to wait and perhaps it would come back. (3RT 553-555, 562-567.) Basse did not say that she had to hang up and go because her car had returned. (3RT 576-577.)

Later, between 9:45 and 10:15 p.m., Basse phoned Doucakis again and said she had searched for her car and found it near a Wal-Mart or Kmart. She was driving off when Clark and his cousin approached her and asked for a ride to Clark's mother's house. Basse said she suspected a robbery had taken place, and Doucakis again advised her to call the police. (3RT 555-557, 567-569.)

Doucakis saw Basse the next morning, and Basse said Clark had taken her car and robbed a Wal-Mart or Kmart. Basse said that she had been in jail overnight for the robbery, but that Clark had gotten her out. Doucakis disbelieved this story and asked Basse to come get her things from Doucakis' place, alone because she did not want Basse or her friends around. Basse did come get her things about 10 days later, and Doucakis noticed two

"knitted things" and a big, bluish-gray bag marked "mart" in her car. Basse kept her from inspecting the objects and stated that they were Clark's. (3RT 557-562.)

At some point, possibly after the collect phone call, Basse said that Clark had threatened her. Doucakis saw Clark twice, and noticed he had a limp. Basse's car had a headlight and a taillight out. (3RT 575-576.)

Shortly after learning of the robbery, probably the day after and certainly not a month later, Doucakis called the Riverside police, who put her in touch with Ron Anderson of the Corona Police, who put her in touch with Jim Anderson of the Hemet police. She told Jim Anderson what Basse had told her. (3RT 569-571.)

During two years they knew each other, Doucakis formed the opinion that Basse was not honest and truthful. (3RT 559-560.) Both defendants wanted to impeach Basse with her admission to Doucakis that she had falsely accused a live-in boyfriend of spousal abuse to gain access to $1800 hidden in his mattress, but the court excluded the proffered evidence on Evidence Code section 352 grounds, even though it had been admitted in the first trial and was one of the facts relied upon by

this Court in its opinion in the first appeal. (1RT 150-155; Opinion, Aug. CT 13.)

Frank Fletcher, manager of the Motel 6 on Redlands Boulevard in San Bernardino, testified that a J. Basse stayed there the night of October 18, left the next day, stayed again the nights of October 20, 21 and 22, 2000, and left on October 23. There were phones in the rooms which could be used free for local calls. (3RT 653-658.)

**Rebuttal.** Jim Anderson testified that his brother Ron contacted him on November 11, 2000, and that he spoke with Doucakis that day. Doucakis said Basse had called her from the McDonald's on October 20, saying that she had stopped there with Clark and another male so she could use the restroom but they took off with her car. Doucakis advised Basse to call the police, but Clark and the other man returned. The next morning Basse told her Clark and the other man had robbed Kmart. Although Anderson spoke with Doucakis several more times, she never mentioned seeing knitted items or a Kmart bag in Basse's car, nor did she say Basse claimed to have found her car by wandering around a nearby parking lot. (3RT 580-581, 583-584.)

# ARGUMENT

## I.

## THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF CLARK'S 1994 BANK ROBBERY, CURTAILING HIS CROSS-EXAMINATION OF THE KEY WITNESS ON THAT ISSUE, AND REFUSING A NEEDED MODIFICATION OF A STANDARD INSTRUCTION TO HIGHLIGHT HIS DEFENSE THEORY, VIOLATING HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR JURY TRIAL

Pursuant to Section 1101, sudivision (b), the
Pursuant to Section 1101, subdivision (b), the court permitted prosecution to present propensity evidence of a 1994 bank robbery in which CLARK WAS INVOLVED TO SHOW COMMON DESIGN OR PLAN BETWEEN THAT robbery and the current offense, from which the jury was permitted to infer that Clark was therefore the person who committed the charged crime. Clark moved to exclude the evidence because the similarities between the two crimes was insufficient, and in any event the evidence was more prejudicial than probative. (CT 43; Aug. CT 17-34; 1RT 32-33, 49-61.) The prosecution introduced the prior and made extensive use of it in closing arguments. (2RT 393-412, 3RT 681, 686, 722-724.)

That initial error itself was bad enough, but the harm flowing from it was exacerbated by two further erroneous rulings which (a) hobbled Clark's efforts on cross-examination to establish that the features of the robberies which assertedly made them similar were far too generic to establish a nexus between them (2RT 404-407) and (b) denied a needed modification to CALJIC No. 2.50 which highlighted the prosecution's heavy burden of proof on the issue (CT 96; 3RT 612-619).

The end results was tht Clark's trial was enherently unfair, in violation of his federal and state constitutional rights to due process,

cross-examination and a fair trial. (U.S. Const., 5th, 6th, 14th Amendments; Cal. Const., Art. I, Sec. 15, 16.)

a. Propensity evidence of the 1994 bank robbery was not admissible under Section 1101.

The due Process Clause through the Fourteenth Amendment, precludes the admission of any evidence, however relavant it may be , that is so unduly prejudicial that it renders a criminal trial fundamentally unfair. (Payne v. Tennessee (1991) 501 U.S. 808, 825; Estelle v. McGuire (1991) 502 U.S. 62, 70.) Admitting propensity evidence violates a fundamental principle of American jurisprudence and common law followed in the United States for over three centuries. (People v. Ewoldt (1994) 7 Cal. 4th 380, 392.) The use of propensity evidence is also contrary to the fundamental principles of fair play and substantial justice which mandate that people convicted for what they have actually done and not who they are. (Garceau v. Woodford (9th Cir. 2001) 275 F.3d 769, 776-777 ; McKinney v. Rees (9th Cir 1993) 993 F2d 1378, 1384; Panzavecchia v. Waiwright (5th Cir. 1981) 658 F.2d 337, 341; United States v. Burkhart (10 Cir 1972) 458 F.2d 201, 205-207 ["[T]he problem is not a single evidentiary one, but rather goes to the fundamentalfairness of the trial itself."].)

The United States Supreme Court has never expressly whether due process permits the admission of uncharged crimes to show a propensity of the accused to commit the charged offense. (Estelle v. McGuire, supra 502 U.S. at p. 75, fn. 5; Smith v. Pliler (9th Cir. 2003) 258 F. Supp. 2d 1069, 1091; Brinegar v. United States (1949) 338 U.S. 160, 174 [suggesting rule against propensity evidence is an essential component of due process]; see also Spencer v. Texas (1967) 385 U.S. 554, 575 (conc. and dis. opn. of Warren, C.J. ["Evidence of prior convictions has been forbidden because it jepordizes the presumption of innocence of the crime

currently charged."]; Boyd v. Untited States (1892) 142 U.S. 450 [prior crimes evidence so prejudiced trial as to require reversal].)

Domestic rules of evidence may not be invoked to preclude a criminal defendant from establishing that he has been denied a fair trial. (See Rock v. Arkansas (1987) 483 U.S. 44, 55-56 [ state prohibition of post-hypnosis testimony violates defendant's right to testify]; Green v. Georgia (1979) 442 U.S. 95, 97 [state exclusion of hearsay confession of second defendant lessoning defendant's culpability violated due process]; Davis v. Alaska (1974) 415 U.S. 308, 315-321 [state policy protecting annonymity of juvenile offenders preventing defendant from cross-examinating key juvenile prosecution witness denied defendant constitutional right to confront witnesses]; Chambers v. Mississippi ((1973) 410 U.S. 284' 294-303 [state evidentiary rules "may not be applied mechanically to defeat ends of justice"] Washington v. Texas (1967) 388 U.S. 14.)

Section 1101, subdivision (a)[4/] sets forth the general rule that evidence of other crimes is inadmisable when offered solely to prov criminal to prove criminal disposition or propensity of the accused to commit the currently-charged crime. Such evidence is deemed objectionable, not because it has no appreciable probative value, but because it has to much, inevitably tempting the trier of fact to accord excessive weight to the ciminal history of the defendant, producing an over-strong tendency to believe the defendant guilty just because he is likely to do such acts. Old Chief v. United States (1997) 519 U.S. 172, 181; People v. Alcala (1984) 36 Cal. 3d 604, 631.)

---

4/ Section1101, provides that, except as otherwise provided, "evidence of a person's character or trait of his ... character ... inadmissable when offered to prove his ... conduct on a specific occasion."

Section 1101, subdivision (b)[5] departs from the centuries-old exclusion of such evidence by providing that evidence of uncharged misconduct *is* admissible when relevant to establish some fact other than the person's character or disposition, such as the presence of a common design or plan, not only on the issue of the existence of the common design or plan, but as proof that the accused actually committed the offense.

To establish a common design or plan, the evidence must demonstrate not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations. (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 393; *People v. Balcom* (1994) 7 Cal.4th 414, 422-424; *People v. Thornton* (1974) 11 Cal.3d 738, 756, disapproved on o.g. in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 ["The strength of the inference in any case depends upon two factors: (1) *the degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks."]

---

[5] Section 1101, subdivision (b) provides in pertinent part:

> "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ...) other than his or her disposition to commit such an act."

(italics in original); *People v. Catlin* (2001) 26 Cal.4th 81, 111.)

Comparatively, the least amount of similarity between the prior act and the newly-charged offense is required to prove intent, because the recurrence of a similar act tends increasingly with each succeeding instance to negate claims of accident, inadvertence, self-defense or good faith mistake. (See *People v. Kelley* (1967) 66 Cal.2d 232, 242-243; *People v. Robbins* (1988) 45 Cal.3d 867, 879-880.)

A greater degree of similarity between the current and prior acts is required for admission of evidence of prior similar conduct to prove that the identity of the perpetrator of the prior acts is the same as the perpetrator of the current offense. (See *People v. Haston* (1968) 69 Cal.2d 233, 245 [it has probative value only to extent that distinctive "common marks" give logical force to the inference of identity].)

The greatest degree of similarity is required to prove the existence of a common design or plan. (*People v. Miller* (1990) 50 Cal.3d 954, 987.) Even though the greatest degree of similarity between prior and newly-charged conduct is required to prove common plan or design, the newly-established admissibility of such evidence, combined with the additional newly-permitted use of it as proof that the accused actually committed the later offense(s), creates the greatest risk of prejudice to the accused when such evidence is admitted, despite the screening process mandated under

Section 352.

Here, the prosecution's offer of proof was that:

> "In each instance you have two people who had borrowed without permission, to use counsel's words, or stolen a car to use so they couldn't be identified with their own cars, of course, drive to an establishment, whether it be a bank, a business or retail store. They walk in, one armed with a gun. The gun man points the gun at whoever the cashier or person behind the counter, controlling the robbery while the other leaps the counter and takes the money out. Then they flee out the door." (1RT 59.)

In truth, however, virtually all of these asserted points of similarity were superficial in the extreme and thus utterly insufficient to suggest a common scheme.

For example, robbers working in pairs are hardly unusual and the use of a stolen or "borrowed" getaway car is so very commonplace as to have become a Hollywood cliche. Parking the getaway car where it is less likely to be observed and using masks to conceal identity are no less routine. Using a gun to control the scene is of course what makes armed robbery armed robbery and must happen hundreds and even thousands of times every day across this country. Leaping over a counter is but one of just two ways to gain access to the money that is the object of the robbery, the other being to rely on the person behind it to hand it over. It would therefore be surprising if a substantial percentage of robberies of banks or businesses did not involve similar leaps.

There is, in short, absolutely nothing that is

unique to the two crimes that either clearly links them to each other or clearly sets them apart from the vast majority of robberies of banks or businesses. In other words, no signature design or plan is manifest.

Not only are the points of similarity unconvincing, but the dissimilarities are striking. In 1994, for example, as set forth by the Court of Appeal in its opinion in the first appeal (Opinion (E031521), Aug. CT 9-10), the robbers made their masks from the sleeves of a sweatshirt or T-shirt and did not have a bag for their loot, instead stuffing the money into their pockets, all of which suggests haphazard planning. The Kmart robbers, on the other hand, took the extra step of equipping themselves with masks and a bag.

The 1994 robbery was of a bank, a much more ambitious target than a Kmart, and it involved a far more ambitious plan as well, with everyone in the bank being ordered to the floor and one of the robbers attempting to compel a bank employee to open the vault while the other emptied all of the cash drawers. That robbery was a takeover robbery, ~~as Clark pointed out below.~~ The Kmart robbers, on the other hand, ordered no one to the floor, grabbed the contents of only two cash drawers, left several others untouched, and then made a run for it, as Clark also pointed out. (1RT 53, 55; CT(E31521) 265.)

The showing the prosecution claimed to be prepared to make thus plainly failed to meet even the minimum standards of admissibility and the trial court erred in

allowing evidence of the prior crime in.

Admitting the prior and permitting its use to conclude that he committed the current offense, due to the propensity shown by the prior violated Clark's state and federal constitutional rights to due process and a fair jury trial. (U.S. Const., 5th, 6th, 14th Amendments)

**b. The trial court abused its discretion in ruling that the evidence of the bank robbery was more probative than prejudicial.**

Moreover, even assuming that the evidence of the 1994 robbery was minimally probative of a common plan or design, its obviously prejudicial effect should have precluded its admission under Section 352.

Under Section 352, the trial court, in its discretion, determines whether the probative value of relevant evidence is outweighed by a substantial danger of undue prejudice; *People v. Waidla* (2000) 22 Cal.4th 690, 724 [evidence which has probative value must be excluded under Section 352 if it "poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome'"]; *People v. Falsetta* (1999) 21 Cal.4th 903, 916 [prejudicial impact of testimony is increased where it confuses issues or inflames jury].)

When the erroneously admitted evidence is challenged as more prejudicial than probative, the argument is essentially a due process argument because due process analysis virtually duplicates Section 352 analysis. "A careful weighing of prejudice against

of FBI agent John MacDonald to establish the 1994 robbery and show Clark's connection with it, Clark sought to demonstrate on cross-examination that what might appear to be unique features of the two robberies, such as the use of masks, stolen getaway cars and out-of-the-way parking spots, were in fact features common to robberies generally. The prosecution objected and the court effectively sustained the objections -- while allowing "a certain amount of questioning along these lines," it told Clark, "... let's try to keep [the questions] specific to this particular situation." (2RT 404-405, 406-407.) This ruling had the visible effect of stymying Clark's attack on what turned out to be crucial evidence.

Such evidence of the common nature of these supposedly distinctive facts was admitted in the first trial, by way of testimony by Riverside Police Sergeant Don Taulli that it was common for bank robbers to steal a car and park it out of sight of the front door, and also common for bank robbers to change their appearance. (See 2RT(E031521) 315-317.) It is difficult to see why that evidence was excluded at the second trial, especially since Clark requested a sidebar to explain its importance.

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. (*Crane v. Kentucky* (1986) 476 U.S.

**d. The court also erred in refusing key language Clark sought to add to CALJIC No. 2.50, concerning the common design or plan exception, further crippling his defense.**

Clark offered a modification of the standard instruction, CALJIC No. 2.50, which would have added another paragraph, drawn from *People v. Ewoldt*, *supra*, 7 Cal.4th at pp. 393. to the effect that: "The evidence of the prior act must demonstrate, not merely a similarity in the result, but such concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations." The court rejected this modification (3RT 616-619), which states correctly the law on the showing which must be made before propensity evidence may be admitted as circumstantial evidence of identity, committing error violating Clark's federal and state constitutional rights to due process and a fair trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-685 [Fourteenth Amendment Due Process Clause guarantees a fair trial, but most basic elements of fair trial are defined in Sixth Amendment]; *United States v. Sayetsitty* (9th Cir. 1997) 107 F.3d 1405, 1414 [defendant has constitutional right to have jury consider defenses permitted by law to negate element of offense].)

When a requested instruction focuses on the defense theory, as it did here, a specific instruction should be given if requested. (*People v. Cook* (1905) 148 Cal. 334, 347 ["It is true that the instruction

given stated the law correctly; but it was brief, general, and colorless in comparison with the instruction asked for, and had the effect of minimizing the importance of a consideration which could not have been stated with too much emphasis."]; *People v. Kane* (1946) 27 Cal.2d 693, 699-702; *People v. Mayo* (1961) 194 Cal.App.2d 527, 537.)

Moreover, the requested language was also necessary to state the prosecution burden of proof for finding common design or plan and identity by use of circumstantial propensity evidence based on past acts. a burden not stated elsewhere. (See § 502; *People v. Sears* (1970) 2 Cal.3d 180, 190; *People v. Simon* (1995) 9 Cal.4th 493, 501; *United States v. Pierre* (9th Cir. 2001) 254 F.3d 872, 876-877 [right to defense theory instruction assigning burden of proof on element of self defense].)

That CALJIC instructions generally covering the subject are given does not relieve the court of its duty to give proper instructions requested by the defendant. CALJIC instructions are not the law -- they are attempts by *ad hoc* committees of judges to state the law. (*McDowell v. Calderon* (9th Cir. 1997) 130 F.3d 833, 841; *People v. Runnion* (1994) 30 Cal.App.4th 852, 858; *People v. Vargas* (1988) 204 Cal.App.3d 1455, 1464.)

Clark was therefore entitled to the added language, which was not repetitive of other instructions and accurately stated the law on the

burden of proof of the degree of similarity between the crimes required before a prior act can be considered on the identity of the perpetrator of the current crime, and the court clearly erred in refusing it.

The admission of the prior under these circumstances violated Clark's state and federal constitutional rights to due process and a fair jury trial by permitting it to serve as the basis for the conclusion that he committed the current offense due to the criminal propensity shown by the prior. (U.S. Const., 5th, 6th and 14th Amendments.) That error was exacerbated when the court excluded critical evidence showing just how generic the propensity evidence was, when it required virtually no time to present, was not cumulative, and it was critical to defend against the propensity evidence..

Moreover, as discussed below, the court further abused its discretion in excluding Clark's evidence bearing directly on the credibility of key prosecution witness Basse, curtailing his attack on her credibility. And finally, the court erred in refusing Clark's non-repetitive instructions accurately stating the law assigning the burden of proof of the degree of similarity between the crimes required before a prior act can be considered on the identity of the perpetrator of the current crime.

The judgment ought therefore to have been reversed for these reasons

probative value under [§ 352] is essential to protect a defendant's due process right to a fundamentally fair trial." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1334.) And, the Section 352 safeguard is required to protect against due process violations. (*People v. Falsetta*, *supra*, 21 Cal.4th at pp. 919-920; *People v. Fitch* (1997) 55 Cal.App.4th 172, 183.)

It is precisely because of the strong potential for prejudice that the law has always rightly been leery of evidence of prior bad acts. Because the similarities between the two crimes involved here were so attenuated that potential prejudice became a demonstrable reality, and the jury was effectively invited to draw the very connection the law says is impermissible: that because Clark committed a robbery he must therefore have committed this one.

The prosecutor's extensive use of the bank robbery evidence in closing argument (3RT 681, 686, 722-724) demonstrates the error was highly prejudicial, because he would not have emphasized it so much if it were not. (*People v. Cruz* (1964) 61 Cal.2d 861, 868; *People v. Woodard* (1979) 23 Cal.3d 329, 341.)

**c. Having once allowed evidence of the 1994 robbery in, the trial court unreasonably curtailed defense cross-examination intended to show that the similarities between the crimes were purely generic.**

Once the prosecution had introduced the testimony

683, 690; *Webb v. Texas* (1972) 409 U.S. 95, 98 [right to present defense is fundamental element of due process]; *Washington v. Texas* (1967) 388 U.S. 14, 19 [right to present defense is also specifically addressed in Compulsory Process Clause of the Sixth Amendment]; *In re Martin* (1987) 44 Cal.3d 1, 30 [Cal. Const., art. 1, § 15 embodies same protection].)

Moreover, Section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of significant probative value to his or her defense. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684; *People v. Cunningham* (2001) 25 Cal.4th 926, 998-999; *People v. Mayfield* (1972) 23 Cal.App.3d 236 [right of defendant to attack his accusers is so fundamental that consumption of time is irrelevant if the evidence is not cumulative]; *People v. Shoemaker* (1982) 135 Cal.App.3d 442; *People v. Salas* (1994) 30 Cal.App.4th 417, 435.

By admitting the evidence of the robbery prior, the court violated Clark's due process right to due process and a fair trial, and exacerbated that error by excluding critical evidence which showed just how generic that propensity evidence was. It would have taken virtually no time to present the evidence (it took five questions and less than two pages of transcript in the prior trial (2RT(E031521) 316-317), it was not cumulative of any other evidence, and it was critical to Clark's defense against the propensity evidence.

II.

THE COURT ERRED IN EXCLUDING BASSE'S ADMISSION THAT SHE HAD FALSELY ACCUSED HER BOYFRIEND SO SHE COULD STEAL HIS MONEY WHEN HE WENT TO JAIL

During trial, the defendants wanted to impeach Basse with her admission to Doucakis that she had falsely accused a live-in boy-friend of spousal abuse in order to gain access of $1800 hidden in his mattress. Co-defendant Williams argued that this evidence was admissible under Section 1101, subdivision (b). The court seemed to think the fact that the boyfreind pleaded guilty tothe offense under cut this contention and, in any case, found the probative value of the evidence to be outweighed by the prejudicial effect. (1RT 150-155.)

The evidence against Clark was weak, and the testimony of the principleprosecution witness, Basse, on the issue of identity was weak at best and heavily impeached. It would not have required much to tip the balance against her. As noted by the Court of Appeal in it's opnion in the first appeal:

"Doucakis testified that Basse was a liar. '[Y]ou can't be-lieve a word she says.' In particular, she testified, Basse had been willing to send her boyfriend to jail for a crime he not committed.6/ And this testimony came from Basse's

---

6/ During trial, the defendants sought to impeach Basse with her admission to Doucakis that she had falsely accused a live-in boyfriend of sposal abuse in order to gain acces to $1800 hidden in his mattress, but the court found the probative value of the evidence outweighed by it's prejudicial effect. This error is

former close friend -- a person Basse herself had chosen to call when she needed help.

"The evidence was consistent with a scenario in which Basse conspired with different Black men to commit the robbery. Unlike Clark and Williams, one was significantly taller than the other. Basse's involvement was shown by the fact that she knew many of the details of the robbery, including that the robbers wore ski masks and got only $300 to $400, her car inferably was used as the getaway car, Vrablic thought she saw three people in the car; and Doucakis saw ski masks and a Kmart bag in Basse's car. Basse then blamed the robbery on Clark and Williams, partly because she was angry at Clark and partly to deflect suspicion from the actual perpetrators. Under that theory, she phoned Doucakis to establish the cover story that her car had been stolen. Interestingly, in Doucakis' account of the phone call, Basse never said it was Clark (or Williams) who had stolen it; she did not supply that little detail until the following day. But, even had she implicated Clark and Williams in that first phone call, that would merely mean she had already formed her plan by them." (Opinion, Aug. CT 12-14.)

And in setting forth this scenario, the Court of Appeal didn't have the benefit of the evidence developed in this trial, that Basse told her counselor about the robbery on the day *before* the night it happened,[7] a fact which coincides remarkably with Basse's other acts reflecting she was setting up her alibi.

The exclusion of this critical evidence on the credibility of key prosecution witness Basse was error

---

discussed separately, below.

[7] 1RT 269-271, 277-278, 282-283, 285-287, 291-294, 298-300, 302, 304-305, 3RT 659.

amounting to an abuse of discretion. (§ 1101, subd. (c); Franklin v. Henry (9th Cir, 1997) 122 F.3d 1270, 1273, overruled on o.g. in Payton v. Woodford (9th Cir. 2002) 299 F.3d 815, 827 [where defendant's guilt hinges largely on testimony of prosecution witness, erroneous exclusion of evidence critical to assessing credibility of a witness violates Constitution]; Davis v. Alaska (1975) 415; Delaware v. Van Arsdall (1986) 475 U.S. 673, 678-679; Olden v. Kentuckey (1998) 488 U.S. 227 [exclution of evidence of prosecution witness' motivation for testifying falsely as unduly prejudicial violated Sixth and Fourteenth Amendments].)

In a case turning on thecredibility of a witness, anything which tends to discredit the defnse witnesses in the eyes of the jury or to bolster the account of prosecution witnesses "requires close scrutiny when determining the prejudicial nature of any error." (People v. Briggs (1962) 58 Cal. 2d 385, 404; see United States v. Carroll (6th Cir. 1994) 36 F 3d 1380, 1384; Green v. United States (D.C. Cir 1994) 651 A.2d 817, 819; United States v. Bess (6th Cir. 1979) 593 F.2d 749, 753; People v. Von Villa (1992) 11 Cal. App. 4th 175, 249.)

Basse's credibility was the key issue in this case, and, partially in the absence of the bank robbery propensity evidence, it would not have taken much for the jury not to believe her. Clark should not have been handicapped in his efforts to attack her credibility through the testimony of her own friend, whom Basse called from McDonald's when she needed help. The court's justification for excluding the evidence, the apparent fact that Basse's boyfriend was convicted on her false allegations, has no basis in fact or law, and contravenes Section 1101, subdivision (c) and the abundant above.

The exclusion of this important evidence under Section 352 also constituted an abuse of discretion, because it's exclusioon violated Clark's federal constitutional rights to due process, contation, and a fair jury trial.

III.

THEJUDGEMENT OUGHT TO BE REVERSED UNER THE DOCTRINES OF THE CLOSE CASE AND CUMULATIVE ERROR

When a case is close a small degree of error in the lower court should, on appeal, be considered enough to have influenced the jury to convict the defendant wrongfully. (People v. Wagner (1975) 13 Cal. 3d 612, 621; People v. Collins (1968) 68 Cal. 2d 319, 332.) Cumulative errors may so infect "the trial with unfairness as to make the resulting conviction a denial of due process." (Donnelly v. DeChristoforo (1974) 416 U.S. 637, 642-643; Greer v. Miller (1987) 483 U.S. 756; People v. Hill (1998) 17 Cal. 4th 800, 844-845; United States v. Wallace (9th Cir. 1988) 848 F.2d 1464, 1472; United states v. McLister(9th Cir. 1979) 608 F.2d 785, 788-791.)

There were numerous errors and the case was close,resting as it did on Basse's credibility. The cumulative result was the denial of Clark's federal constitutional right to an inherently fair trial. Even under Watson, it is reasonably probable that Clark would not have been convicted in the absence of these errors. Altogether the court's multiple errors in admitting the evidence of the prior robbery despite the safeguard of Section 352, excluding Clark's evidence that similarities between the crimes were purely generic, and refusing his language properly defining the burden of proof for using propensity evidence as proof of the current offense, separately and together contributed to an essentially unfair trial,

in violation of his federal and state constitutional rights to due process and a fair trial. (U.S. Const., 5th, 6th, 14th Amendments; art. I, §§ 15, 16)

The judgement should, therefore, be reversed becaused of the numoeous cumulative errors.

IV.

UNDER CUNNINGHAM V. CALIFORNIA, 549 U.S. ____ (2007) PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED, WHERE THE SENTENCING COURT ELAVATED HIS SENTENCE FROM THE MIDDLE-TERM TO THE HIGH-TERM BASED ON AGGRAATING FACTORS NOT FOUND BY A JURY

In Cunningham v. California the U.S. Supreme Court decided that California's (DSL) "violates a defendant's right to trial by jury safeguarded by the Sixth and Fourteenth Amendments." This ruling, in turn, made the holding in Blakely v. Washington, 542 U.S. 296; that "[o]ther than the fact of a prior conviction, any fact that inceases the penalty for a crime beyond the prescribed maximum must be submitted to a jury and proven beyond a reasonable doubt;" applicable to California cases.

In petitioner's case, the court that sentenced him was not the sme court that presided over his trial. Thus, It was only privy to information which was availible from the probation report prepared for sentencing at the end of his first trial in 2002 (See 3RT: 752-755); a report that the court initially stated "[did not] give much substantiation for the upper term." (3RT 752: 27-28) After hearing comments from both the prosecution and the defense found the following aggravating factors: (1) The presence of a firearm created a threat of great bodily harm, (2) the robbery involved planning sophistication, and professionalism, (3) defendant had a criminal history in ###### which his crimes are escalating in seriousness, (4) defendant was on

parole when he committed the charged offense, and (5) defendant had a prior prison term for another serious felony offense (robbery). Petitioner raised the issue of "Blakely" error, as to these aggravating factors, on direct appeal.

The State Appellate Court held that even assuming that jury findings were required as to the first two factors, jury findings were not required on the remaining three because they "[fell] within the recidivism exception to Blakely." Citing Almendarez-Torres v. United States (1998) 523 U.S. 224, 246 and People v. Thomas (2001) 91 Cal. App. 4th 212, 216-223) the court reasoned that "[t]hese factors ... do not require jury findings. These factors are premised on defendant's prior convictions and verifiable by means of the court record, which includes defendant's criminal history." (Appellate opinion at p. 23) Petitioner contends that because the circumstances in both Almendarez-Torres and Thomas are very different from those in his case, the State's reliance on these cases is misplaced.

Unlike the case in Almendarez-Torres petitioner only admitted to having suffered a prior serious felony conviction, as an adult; an allegation which was charged in the indictment. He made no concession to the fact that he had either served a prior prison term on that conviction, or that he was on parole at the time that he committed the current crime. Unlike the case in Thomas, there was no evidence presented, "hav[ing] the the constitutional requisite level of reliability so as to meet [] pertinent due process concerns" (People v. Thomas, supra. at 216-223) to establish either of these factors as facts. Therefore, under Blakely, the issue of petitioner's parole status and prior prison term should have been decided by a jury.

Even assuming, arguendo, that these factors could have been proven beyond a reasonable doubt on remand for resentencing, they still could not be used by the court to aggravate petitioner's sentence.

It has been well settled in California Courts that a fact used to enhance a sentence, and to be served consecutively to that sentence, is prohibited from use, again, to aggravate. (See People v. Fernandez 276 Cal. Rptr. 631, 637 [citing People v. Colman (1989) 255 Cal. Rptr. 813, 844-43]) Petitioner was given a 5 year enhancement for his prior robbery, prohibiting any factors based on that prior from being used again to aggravate his sentence to the high term. This would also hold true for the "threat of bodily harm" factor, since petitioner received a 1 year enhancement for the use of a fire arm.

As to the "escalating criminal history" factor, the 9th Circuit has held that the use of a defendant's prior juvenile adjudications to enhance his sentence on a current charge is unconstitutional. United States v. Tighe (2001) 226 F.3d 1187) As such, in evaluating petitioner's criminal history, a trier of fact could only have considered his one adult conviction; another armed robbery, which was arguably more serious, as to the operative facts of that case, than the his current crime. More importantly, this evaluation is precisely the type, determined by Blakely, to be made by a jury, and not a sentencing judge who neitherheard the present case, nor knew any of the facts of the prior.

The final factor used in aggravation was the finding that "the robbery involved planning, sophistication, and professionalism." Petitoner contends that this "so called" fact is the simplest one to deal with since it was neither inherent in the jury's verdict, embaced by any admission by petitioner, nor was it a "recidivism" factor that falls within the recidivism exception to Blakely.

CONCLUSION

For the reasons stated above petitioner request that this Honorable Court grant him the relief sought in his case.

RELIEF SOUGHT

WHEREFORE, Petitioner Donshael D. Clark moves this Honorable Court to grant the following relief:

a) Accept jurisdiction over this case pursuant to 28 U.S.C. § 2254;

b) Require the Respondent to answer the allegations in this petition and the Brief in Support;

c) Hold such evidentiary hearing as this Court may deem necessary or apropriate;

d) Issue an Order that this Court grant a Writ of Habeas Corpus granting Petitioner a new trial, or at the very least the upper term imposed be reduced to the three year mid-term, doubled; and

e) Issue a Writ of Habeas Corpus freeing petitioner from his unconstitutional confinement.

Respectfully submitted,

[signature]

Donshael D. Clark # T-50753
A2-119
P.O. Box 901
Imperial, CA 92251

In Propria Persona

# APPENDIX

EXHIBIT "A"

EXHIBIT "A"

SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

SEP 05 2006

IN THE MATTER OF THE
PETITION OF:

Donshael D. Clark

VS.

Larry E. Scribner,
Warden

FOR A WRIT OF HABEAS CORPUS

CASE NO. SWC 000104

**ORDER RE:**
**PETITION FOR**
**WRIT OF HABEAS CORPUS**

The Court having read and considered the Petition for Writ of Habeas Corpus filed , hereby orders the following:

(✓) 1. Pursuant to Section 260(a) and (e) of the California Rules of Court, the petition is denied for the following:

(A) ✓ Petitioner has failed to allege sufficient facts to established a prima facie case for petitioner's release. (The allegations are vague and conclusionsary).

(B)___ Petitioner has failed to exhaust his/her administrative remedies.

(C)___ The facts alleged in support of the petition have been previously considered and the earlier petition was denied on ____________.

(D)___ The circumstances described in support of the petition have changed, thereby rendering the petition moot.

(E)___ Other: ____________________________________

( ) 2. The Attorney General/District Attorney is ordered to show cause why the petition should not be granted and shall file a return with 30 days of service of this order.

( ) 3. The court, having considered the petition, return, denial, declarations and matters of judicial notice, finds there is a reasonable likelihood that petitioner may be entitled to relief and the interest of justice require petitioner's presence at the hearing.

Matter set for (evidentiary hearing) (oral argument) on __________ at _____ am/pm in Department______.

( ) 4. The petition is granted and a Writ of Habeas Corpus shall issue with the following specific relief:

______________________________________________________________

______________________________________________________________

( ) 5. After considering the petition, return (denial) (evidence presented at the hearing), the petition is denied for the following reason(s) :

______________________________________________________________

______________________________________________________________

( ) 6. The petition makes a prima facie showing concerning questions arising before or during the trial or sentencing of petitioner and this court deems the showing to be of sufficient substance to suggest consideration by the sentencing court. Griggs v. Superior Court (1976) 16 Cal 3d 341.

( ) 7. The petition is transferred to the Superior Court of California, County of ______________ which rendered judgment against the petitioner for consideration and disposition by that court.

Date: Aug. 22, 2006

______________________________
JUDGE OF THE SUPERIOR COURT



# CLERK'S CERTIFICATE OF MAILING

I, Clerk of the Superior Court, County of Riverside, do hereby certify I am not a party to the above action: On 9-5-06, I served a copy of the foregoing Order by depositing said copy in a sealed envelope with prepaid postage, in the mail at Murrieta, California addressed as indicated.

Date: 9-5-06

Deputy Clerk: [signature]

[X] ATTORNEY GENERAL
P O BOX 85266
SAN DIEGO, CA 92186

[ ] DISTRICT ATTORNEY
46-209 OASIS STREET
INDIO, CA 92201

[ ] DISTRICT ATTORNEY
4075 MAIN STREET
RIVERSIDE, CA 92501

[ ] DISTRICT ATTORNEY
30755-D AULD ROAD
MURRIETA, CA 92563

EXHIBIT "B"

EXHIBIT "B"

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

FILED
OCT 18 2006
COURT OF APPEAL FOURTH DISTRICT

**ORDER**

| | |
|---|---|
| In re<br>DONSHAEL DOMANIQUE CLARK<br>on Habeas Corpus. | E041522<br>(Super.Ct.Nos. HEF003866 & SWC000104)<br>The County of Riverside |

THE COURT

The petition for writ of habeas corpus is DENIED.

McKINSTER
Acting P.J.

cc: See attached list

COPY

EXHIBIT "C"

S148977

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re DONSHAEL DOMANIQUE CLARK on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
FILED

SEP 25 2007

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

EXHIBIT "D"

SUPERIOR COURT OF CALIFORNIA, COUNTY OF RIVERSIDE
www.riverside.courts.ca.gov

[ ] 4100 Main Street, Riverside, CA 92501
[ ] 4050 Main Street, Riverside, CA 92501
[ ] 4175 Main Street, Riverside, CA 92501
[ ] 880 N. State Street, Hemet, CA 92543
[ ] 41002 County Center Dr. #100 Temecula, CA 92591
[ ] 135 N. Alessandro Rd. Banning, CA 92220
[ ] 505 S. Buena Vista Ave., Corona, CA 91720
[ ] 13800 Heacock #D201, Moreno Valley, CA 92553

## CLERKS CERTIFICATE OF MAILING

SOUTHWEST JUSTICE CENTER
30755 D AULD RD
MURRIETA, CA 92563

APPELLANT: VICTOR M ALMAGER
VS.
RESPONDENT: DONSHAEL D CLARK
Case No. SWC000172

TO: DONSHAEL D CLARK
P O BOX 901
CENTINELA STATE PRISON
IMPERIAL CA 92251

I, clerk of the above entitled court, do hereby certify I am not a party to the within action or proceeding; that on the date below indicated, I served a copy of the attached OSC WHY PET SHLD NOT BE GRANTED depositing said copy enclosed in a sealed envelope with postage thereon fully prepaid in the mail at Riverside, California addressed as above.

CLERK OF THE COURT

Dated: 08/31/07

SUPERIOR COURT OF CALIFORNIA EUREKA COUNTY OF RIVERSIDE

By: mb
MARIA BISHOP

Notice 'CCM' has been printed for the following Attorneys/Firms or Parties for Case Number SWC000172 on 8/31/07:

DONSHAEL D CLARK
P O BOX 901
IMPERIAL,CA 92251

DISTRICT ATTORNEY
30755 D AULD RD
MURRIETA CA 92563

ATTORNEY GENERAL
P.O. BOX 85266
SAN DIEGO, CA 92186

Case Number : SWC000172
Case Type ..: SOUTHWEST CIVIL
Category ...: Writ of Habeas Corpus
Case Status : Active
Jurisdiction: South West

Complaint Type : Habeas Corpus Filed : 8/21/07

| Petitioner(s): | Respondent(s): | |
|---|---|---|
| DONSHAEL D CLARK<br>T-50753<br>ATTORNEY:<br>Pro/Per | VICTOR M ALMAGER | Not Served |

| Action Date | Description | Disposition |
|---|---|---|
| 8/21/07 | Petition for Writ of Habeas Corpus filed | - |
| | Petition and Party Information Entered | - |
| 8/31/07 | Order ON PETITION FOR WRIT OF HABEAS CORPUS by FOR ATTY GENERAL/DISTRICT ATTY TO SHOW CAUSE; Honorable JUDGE JUDITH C CLARK.<br>The Attorney General/District Attorney is ordered to show cause why the petition should not be granted and shall file a return with 30 days of service of this order.<br>***Actual judge's order made on 8/21/07. Notice and copies sent to Attorney General. Notice and copies sent to District Attorney. | - |
| | Clerk's Certificate of Mailing of OSC WHY PET SHLD NOT BE GRANTED/FILE RETURN 30DAYS filed<br>Notice Sent to DONSHAEL D CLARK | - |

**** END OF CASE PRINT ****

SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE
NOV 27 2007
mb

IN THE MATTER OF THE PETITION OF:

DONSHAEL D CLARK

VS.

VICTOR M ALMAGER

FOR A WRIT OF HABEAS CORPUS

CASE NO. SWC000172

**ORDER RE:**
**PETITION FOR**
**WRIT OF HABEAS CORPUS**

The Court having read and considered the Petition for Writ of Habeas Corpus filed 11/13/07 , hereby orders the following:

( ) 1. Pursuant to Section 260(a) and (e) of the California Rules of Court, the petition is denied for the following:

(A)___Petitioner has failed to allege sufficient facts to established a prima facie case for petitioner's release. (The allegations are vague and conclusionsary).

(B)___Petitioner has failed to exhaust his/her administrative remedies.

(C) ✓ The facts alleged in support of the petition have been previously considered and the earlier petition was denied on Sept. 25, 2007

(D)___The circumstances described in support of the petition have changed, thereby rendering the petition moot.

(E)___Other:________________________________________

( )2. The Attorney General/District Attorney is ordered to show cause why the petition should not be granted and shall file a return with 30 days of service of this order.

( ) 3. The court, having considered the petition, return, denial, declarations and matters of judicial notice, finds there is a reasonable likelihood that petitioner may be entitled to relief and the interest of justice require petitioner's presence at the hearing.

Matter set for (evidentiary hearing) (oral argument) on __________ at _____ am/pm in Department______.

( ) 4. The petition is granted and a Writ of Habeas Corpus shall issue with the following specific relief:

____________________________________________________________

____________________________________________________________

( ) 5. After considering the petition, return (denial) (evidence presented at the hearing), the petition is denied for the following reason(s) :

____________________________________________________________

____________________________________________________________

( ) 6. The petition makes a prima facie showing concerning questions arising before or during the trial or sentencing of petitioner and this court deems the showing to be of sufficient substance to suggest consideration by the sentencing court. Griggs v. Superior Court (1976) 16 Cal 3d 341.

( ) 7. The petition is transferred to the Superior Court of California, County of _____________ which rendered judgment against the petitioner for consideration and disposition by that court.

Date: 11/19/07

SUPERIOR COURT OF CALIFORNIA COUNTY OF RIVERSIDE

JUDGE OF THE SUPERIOR COURT

# CLERK'S CERTIFICATE OF MAILING

I, Clerk of the Superior Court, County of Riverside, do hereby certify I am not a party to the above action: On 11/27/07, I served a copy of the foregoing Order by depositing said copy in a sealed envelope with prepaid postage, in the mail at MURRIETA, California addressed as indicated.

Date: 11/27/07

Deputy Clerk: [signature]

[X] ATTORNEY GENERAL
P O BOX 85266
SAN DIEGO, CA 92186

[ ] DISTRICT ATTORNEY
46-209 OASIS STREET
INDIO, CA 92201

[ ] DISTRICT ATTORNEY
4075 MAIN STREET
RIVERSIDE, CA 92501

[X] DISTRICT ATTORNEY
30755-D AULD ROAD
MURRIETA, CA 92563